| SHARLENE Y. ROBINSON, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| | ) | **MEMORANDUM AND ORDER** |
| v. | ) | |
| | ) | |
| DEUTSCHE BANK NATIONAL TRUST | ) | |
| COMPANY AS TRUSTEE FOR | ) | |
| ARGENT SECURITIES TRUST, ASSET- | ) | |
| BACKED PASS-THROUGH | ) | |
| CERTIFICATE SERIES 2006-M1 and | ) | |
| HOMEWARD RESIDENTIAL INC. | ) | |
| F/K/A AMERICAN HOME MORTGAGE | ) | |
| SERVICING, INC., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the court on Plaintiff Sharlene Robinson's Motion for Preliminary

Injunction, found within Docket Entry 1-1, and the Motion to Dismiss [DE-14] filed by Defendants

Deutsche Bank National Trust Company as Trustee for Argent Securities Trust, Asset-Backed Pass-

Through Certificates Series 2006-M1 ("Deutsche Bank") and Homeward Residential, Inc. f/k/a

American Home Mortgage Servicing, Inc. ("Homeward") (collectively, "Defendants"). Both

motions are ripe for disposition.

## I. STATEMENT OF THE CASE

Plaintiff initiated this action by filing a Complaint against Defendants in the North Carolina

General Court of Justice, Superior Court Division in Wake County. Plaintiff asserts various state

law claims against Defendants arising out of Plaintiff's inability to obtain a modification of her home

mortgage and the eventual foreclosure on her home. While the action was pending before it, the Wake County Superior Court entered a Temporary Restraining Order on August 9, 2012, enjoining Defendants from selling or otherwise transferring title to the property at issue in this action. *See* August 9, 2012, Temporary Restraining Order [DE-1-1] at p. 74.

On September 7, 2012, Defendants filed a Notice of Removal [DE-1] in this court. On September 11, 2012, after being notified of the action, the undersigned issued an Order [DE-6] noting that the exhibits filed with the Notice of Removal did not indicate whether a hearing had been held on Plaintiff's Motion for Preliminary Injunction, which was filed in the Wake County Superior Court. The September 11, 2012, Order directed Defendants to file a notice informing the court of the status of Plaintiff's Motion for Preliminary Injunction, and setting a response deadline to the motion if the Wake County Superior Court had not yet ruled on that motion. In their timely response [DE-7] to the September 11, 2012, Order, Defendants stated that prior to the removal of this action, the Wake County Superior Court had extended the Temporary Restraining Order through September 24, 2012, but had not conducted a hearing on the Motion for Preliminary Injunction. The parties thereafter filed consent motions [DE-8; DE-9] to extend the time for Defendants to file an Answer and a response to the Motion for Preliminary Injunction, both of which were allowed. *See* September 14, 2012, Order [DE-10]; September 19, 2012, Order [DE-12]. The parties also filed a consent motion [DE-11] to extend the Temporary Restraining Order until such time as the court rules on the Motion for Preliminary Injunction, which was allowed by the court [DE-13].

On September 28, 2012, Defendants filed a Motion to Dismiss [DE-14] the Complaint in this action, and their response [DE-16] to the Motion for Preliminary Injunction. In their memorandum in support [DE-15] of the Motion to Dismiss, Defendants contend portions of Plaintiff's Complaint

2

are an attempt to re-litigate issues that have already been judicially determined by the North Carolina state courts and should therefore be dismissed for lack of subject matter jurisdiction. Defendants also contend that Plaintiff fails to state any claim in the Complaint. Plaintiff filed her response [DE-17] to the Motion to Dismiss, but did not file any reply in support of her Motion for Preliminary Injunction. Defendants timely filed a reply [DE-19] in support of the Motion to Dismiss, and the motions are therefore ripe for ruling.

## II. STATEMENT OF THE FACTS

The following facts are alleged in the Complaint. On February 4, 2000, Plaintiff and her now ex-husband purchased a home located at 4219 Viewmont Drive in Raleigh, North Carolina. Compl. ¶ 4. Between the purchase of the home in February of 2000 and May 23, 2006, Plaintiff and her then-husband refinanced their home mortgage six times. Compl. ¶ 5. In the sixth refinancing on May 23, 2006, Plaintiff and her then-husband entered into a loan transaction secured by her home, and signed a Note with a principal balance of $116,000.00, made payable to Argent Mortgage Company ("Argent").[1] Compl. ¶ 5. The Note was secured by a Deed of Trust. Compl. ¶ 5. Plaintiff later separated from her husband but continued to live in the home, and in 2011, she and her ex-husband executed a deed to the property transferring ownership to Plaintiff alone. Compl. ¶¶ 21-22.

Plaintiff had difficulty making the mortgage payments, and applied for a loan modification from her loan servicer, Defendant Homeward, in late 2010 or early 2011. Compl. ¶¶ 23, 25-27. In May of 2011, Defendant Homeward offered Plaintiff a loan modification pursuant to the federal

---

[1] Plaintiff alleges that Argent placed Plaintiff's loans and numerous other loans into a securitized mortgage pool. She alleges that Argent and Deutsche Bank entered into a joint venture governed by a Pooling and Servicing Agreement, whereby Argent is the depositor of the loans and Deutsche Bank holds the loans as Trustee. Compl. ¶¶ 13-17.

3

Home Affordable Modification Program ("HAMP"). Compl. ¶ 30, 33. Plaintiff alleges that "HAMP creates a system whereby the government subsidizes the cost of mortgage modifications on lenders, in exchange for the servicers' participation in a standard process for mortgage modification" and that "[t]o opt into HAMP, a servicer must execute a Servicer Participation Agreement"("SPA"). Compl. ¶ 33. Plaintiff alleges the 2011 loan modification offered to her did not comply with HAMP's affordability requirements, which she contends requires an offered modification to reduce the monthly payment to 31% of a borrower's gross income. Compl. ¶ 35. Rather, she contends the 2011 loan modification offered by Defendant Homeward required monthly payments amounting to 45% of her gross monthly income. Compl. ¶ 35.

Plaintiff was not able to pay her monthly mortgage payments under the 2011 modification, and she contacted Defendant Homeward in or around March of 2012 to request another loan modification. Compl. ¶ 36. She contends that Defendant Homeward incorrectly informed her that she could not apply for another loan modification until May of 2012. Compl. ¶¶ 36-39. After contacting Defendant Homeward on May 4, 2012, Plaintiff received a loan modification packet informing her she had 30 days to submit her paperwork to Defendant Homeward for a loan modification. Compl. ¶ 43. Plaintiff submitted her application on May 30, 2012. Compl. ¶ 50.

Meanwhile, Defendants commenced foreclosure proceedings against Plaintiff's home on February 29, 2012. Compl. ¶ 44. A foreclosure hearing took place on May 7, 2012, but Plaintiff chose not to attend, "believing that the only options that would enable her to keep her home were a loan modification or a Chapter 13 bankruptcy." Compl. ¶ 46. Plaintiff alleges that she contacted a bankruptcy attorney in or around March of 2012, and planned to file a Chapter 13 bankruptcy to save her home if she was not able to receive consideration for a loan modification. Compl. ¶ 40.

4

At the May 7, 2012, foreclosure hearing, the Assistant Clerk of Superior Court issued an order allowing the foreclosure sale. Compl. ¶ 47.

Plaintiff contends Defendant Homeward advised her on May 29, 2012, that the foreclosure sale of her home was scheduled to take place on June 6, 2012, and that she was told she needed to submit the loan modification documentation before that date to keep the sale from taking place. Compl. ¶ 49. Plaintiff thereafter contacted Defendant Homeward on June 4, 2012, to confirm that it had received her paperwork. Compl. ¶ 51. Plaintiff alleges that during the June 4, 2012, phone call, Defendant Homeward informed her that it had received her paperwork, but it required additional documents. Compl. ¶ 52. She also alleges that an employee or agent of Defendant Homeward told her that no foreclosure sale was scheduled and no sale of her home would take place pending consideration of her application for a loan modification. Compl. ¶ 52. Plaintiff faxed additional documents to Defendant Homeward on June 4, 2012. Compl. ¶ 54. She also proceeded to cancel an appointment with her Chapter 13 bankruptcy attorney because she believed, based on Defendant Homeward's representations, that it would consider her application for a loan modification before proceeding to sell her home. Compl. ¶ 55.

Defendant Homeward did not, however, stop the foreclosure sale, and the Substitute Trustee conducted the sale on June 6, 2012. Compl. ¶ 56. Defendant Deutsche Bank purchased the home for $75,000. Compl. ¶¶ 56-57. The deed to the home was transferred to Deutsche Bank on June 20, 2012. Compl. ¶ 59. On that same date, Plaintiff first became aware that her home had been sold when she received a flyer from a real estate agent informing her the home had been foreclosed upon and offering her "cash for keys," an offer of payment of a sum of money in exchange for signing an agreement to move out the property immediately. Compl. ¶ 60. Plaintiff thereafter contacted the

5

Substitute Trustee and Defendant Homeward to find out why the sale had been conducted. Compl.
¶ 62.

Plaintiff was scheduled to be evicted from her home on August 13, 2012, but State Superior
Court Judge G.W. Abernathy issued a Temporary Restraining Order enjoining the eviction. As
stated above, the parties have agreed to keep the terms of the Temporary Restraining Order in place
pending this court's ruling on Plaintiff's Motion for Preliminary Injunction.

## III. MOTION TO DISMISS

### A.    Standard of Review

Because the existence of subject matter jurisdiction is a threshold issue, this court must
address Defendants' Motion to Dismiss pursuant to Rule 12(b)(1) before addressing the merits of
the case. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 95-102 (1998); *accord Jones v.
Am. Postal Workers Union*, 192 F.3d 417, 422 (4th Cir. 1999). Subject matter jurisdiction is both
a constitutional and statutory requirement which restricts federal judicial power to a limited set of
cases and controversies. Thus, "no action of the parties can confer subject matter jurisdiction upon
a federal court." *Ins. Corp. of Ir. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982).
The party seeking federal jurisdiction has the burden of proving that subject matter jurisdiction
exists. *See Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th
Cir. 1991). When a defendant challenges subject matter jurisdiction, "the district court is to regard
the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the
pleadings without converting the proceeding to one for summary judgment." *Id.* A district court
should grant a Rule 12(b)(1) motion to dismiss "only if the material jurisdictional facts are not in
dispute and the moving party is entitled to prevail as a matter of law." *Id.*; *see also Evans v. B.F.*

6

*Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999).

The purpose of a motion to dismiss under Rule 12(b)(6), meanwhile, is to test the legal sufficiency of a complaint, not to resolve conflicts of fact or to decide the merits of the action. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243-44 (4th Cir. 1999). In considering a motion to dismiss, the court assumes the truth of all facts alleged in the complaint and the existence of any fact that can be proved, consistent with the complaint's allegations. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). However, the "'[f]actual allegations must be enough to raise a right to relief above the speculative level' and have 'enough facts to state a claim to relief that is plausible on its face.'" *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 616 n.26 (4th Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)). "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Twombly*, 550 U.S. at 555 (citations omitted). Moreover, a court "need not accept the legal conclusions drawn from the facts" nor "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000) (citation omitted). A district court may allow a motion to dismiss based on a defendant's affirmative defense "if all facts necessary to the affirmative defense 'clearly appear [] on the face of the complaint.'" *Goodman v. Praxair, Inc.*, 494 F.3d 458, 463 (4th Cir. 2007) (quoting *Richmond, Fredericksburg & Potomac R.R. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993)).

**B.    Analysis**

Plaintiff asserts the following claims: (1) violation of the duty of good faith and fair dealing, or in the alternative, violation of the North Carolina Unfair and Deceptive Trade Practices Act

7

("UDTPA"), N.C. Gen. Stat. § 75-1.1 et seq., brought against all Defendants; (2) constructive fraud brought against all Defendants; (3) gross negligence brought against all Defendants; and (4) violation of the UDTPA brought against all Defendants.[2] Defendants argue that all claims should be dismissed. In so arguing, Defendants state that portions of Plaintiff's Complaint should be dismissed for lack of subject matter jurisdiction under the *Rooker-Feldman* doctrine.[3] Specifically, Defendants argue that to the extent that Plaintiff seeks to enjoin her eviction and impose a constructive trust on the property, her claims are an attempt to re-litigate issues that have already been judicially determined by the North Carolina state courts.[4] Defendants also argue that Plaintiff fails to allege sufficient facts to maintain her various claims.

## 1.    Rooker-Feldman Doctrine and Res Judicata

### a.    Rooker-Feldman Doctrine

In *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923), the United States Supreme Court held that a litigant who lost in state court could not seek review of the state court judgment in a federal district court. *Id.* at 415-16. In *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462

---

[2] Plaintiff states that she is willing to stipulate to a voluntary dismissal of her fifth cause of action, violation of the UDTPA asserted against Defendant Deutsche Bank. Resp. [DE-17] at p. 23.

[3] In their memorandum in support of the Motion to Dismiss, Defendants also state that the "the action" should be dismissed and that "the entire Complaint" should be dismissed. *See* Mem. [DE-15] at pp. 6-8. Defendants make clear in the reply, however, that their arguments regarding the *Rooker-Feldman* doctrine are directed to Plaintiff's allegations that the deed to the property should be placed in a constructive trust and that her eviction should be enjoined. *See* Reply [DE-19] at p. 10.

[4] By stating that "[p]ortions of Plaintiff's Complaint are an attempt to re-litigate issues that have already been judicially determined by the North Carolina state courts," *see* Mem. [DE-15] at p. 6, Defendants appear also to be raising issues of preclusion (as opposed to only arguing that the application of the *Rooker-Feldman* doctrine prevents this court from exercising jurisdiction). *See Lance v. Dennis*, 546 U.S. 459, 466 (2006) ("The District Court erroneously conflated preclusion law with *Rooker-Feldman* . . . [which] is not simply preclusion by another name."). For the sake of completeness, the court will address these apparent preclusion arguments below.

(1983), the Court reaffirmed the basic rule laid down in *Rooker*, and further concluded that federal district courts do not have subject matter jurisdiction over claims the state court did not directly decide, but that are nevertheless "inextricably intertwined" with state court decision. *Id.* at 486-87; *see also Plyler v. Moore*, 129 F.3d 728, 731 (4th Cir. 1997) (explaining the "inextricably intertwined" language from *Feldman*). The *Rooker* and *Feldman* Courts both reasoned that federal law lodges appellate jurisdiction over state court judgments exclusively in the United States Supreme Court. *Exxon Mobil Corp. v. Saudi Basic Indus.*, 544 U.S. 280, 283 (2005) (explaining that in *Rooker* and *Feldman* the Court "emphasized that appellate jurisdiction to reverse or modify a state-court judgment is lodged, initially by § 25 of the Judiciary Act of 1789, 1 Stat. 85, and now by 28 U.S.C. § 1257, exclusively in this Court").

In *Exxon*, however, the Supreme Court significantly narrowed the scope of the *Rooker-Feldman* doctrine. Prior to *Exxon*, lower federal courts had interpreted *Rooker* and *Feldman* to mean that the loser in state court "was barred from bringing suit in federal court alleging the same claim or a claim that could have been brought in the state proceedings." *Davani v. Va. Dept. of Transp.*, 434 F.3d 712, 713 (2006). In *Exxon*, the Supreme Court confined the *Rooker-Feldman* doctrine to "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon*, 544 U.S. at 284.

Accordingly, post-*Exxon*, the Fourth Circuit Court of Appeals has explained:

Whereas in [cases pre-*Exxon*] we examined whether the state-court loser who files suit in federal court is attempting to litigate claims he either litigated or could have litigated before the state court, *Exxon* requires us to examine whether the state-court loser who files suit in federal district court seeks redress for an injury caused by the state-court decision itself. If he is not challenging the state-court decision, the

9

*Rooker-Feldman* doctrine does not apply. If, on the other hand, he is challenging the state-court decision, the *Rooker-Feldman* doctrine applies. It is important to note that the *Rooker-Feldman* doctrine applies in this second situation even if the state-court loser did not argue to the state court the basis of recovery that he asserts in the federal district court. A claim seeking redress for an injury caused by the state-court decision itself–even if the basis of the claim was not asserted to the state court–asks the federal district court to conduct an appellate review of the state-court decision.

*Davani*, 434 F.3d at 718-19 (citations omitted). Thus, the phrase "inextricably intertwined" "does not create an additional legal test for determining when claims challenging a state-court decision are barred, but merely states a conclusion: if the state-court loser seeks redress in federal district court for the injury caused by the state-court decision, his federal claim is, by definition, 'inextricably intertwined' with the state-court decision, and is therefore outside the jurisdiction of the federal district court." *Id.* at 719.

Consequently, the task for this court is to determine whether the challenged claims satisfy the four essential elements of the *Rooker-Feldman* doctrine, as explained by the Court in *Exxon*. Namely, the court is to determine whether the claims are: (1) brought by a state-court loser; (2) complaining of injuries caused by a state-court judgment; (3) rendered before the instant proceedings commenced; and (4) inviting this court's review and rejection of the state court judgment. Defendants state that the doctrine applies, arguing that "Plaintiff is complaining of the state court foreclosure, which was allowed prior to Plaintiff initiating this action, and is seeking an order from this Court allowing her relief based on the determination that the foreclosure should not have been allowed–in direct contrast to the state court ruling." Mem. [DE-15] at p. 7. Plaintiff, however, contends that the claims through which she asks the court to place the deed to the property in a constructive trust arise from actions taken by Defendant Homeward after the foreclosure hearing took place.

10

Based on the foregoing, the court finds that there is no dispute that Plaintiff lost in state court, and that the state-court order permitting foreclosure was rendered before Plaintiff commenced this case. The court finds, therefore, that the pertinent inquiry is whether Plaintiff is complaining of an injury caused by the order permitting foreclosure, and whether her claims invite the court's review and rejection of that judgment.

The order permitting foreclosure certainly contributed to Plaintiff's injury; indeed, without such an order, the foreclosure sale could not legally take place. Based on the facts as alleged by Plaintiff, however, the proximate cause of her injury was her reliance on a false or incorrect representation from Defendant Homeward that the foreclosure sale, although legally permitted to go forward, would not be held pending her application to modify her loan. *See* Compl. (alleging that Plaintiff relied on Defendant Homeward's expertise in the loss mitigation process and its representations that a foreclosure sale would not be held while her application was pending, and that Defendant Homeward breached its duty by not providing her with accurate information about the status of the foreclosure of her home). The source of Plaintiff's injury, therefore, is not the state court order permitting foreclosure, but Defendant Homeward's actions after the order was issued. *See Davani*, 434 F.3d at 717 (explaining that pre-*Exxon*, the courts in the Fourth Circuit incorrectly "extended the *Rooker-Feldman* doctrine to apply in situations where the plaintiff, after losing in state court, seeks redress for an injury allegedly caused by the *defendant's actions*" (emphasis in original)).

In so finding, the court is cognizant that generally, if a third party's actions are the product of a state court judgment, then a plaintiff's challenge to those actions are in fact a challenge to the judgment itself. *See, e.g.*, *Hoblock v. Albany Cnty. Bd. of Elections*, 422 F.3d 77, 88 (2d Cir. 2005)

11

(recognizing that in some circumstances, federal suits that purport to complain of injury by individuals in reality complain of injury by state-court judgments, and explaining that generally "a federal suit complains of injury from a state-court judgment, even if it appears to complain only of a third party's actions, when the third party's actions are produced by a state-court judgment"). Here, however, Defendant Homeward's actions were not caused by the order permitting foreclosure. Although the order is not in the record before the court, most such orders issued by clerks in North Carolina merely authorize or permit a trustee to conduct a foreclosure sale; the order does not compel the trustee to do so. *See* N.C. Gen. Stat. § 45-21.16(d) (providing that if the clerk finds that the statutorily enumerated requirements are met, the clerk "shall authorize the mortgagee or trustee to proceed under the instrument, and the mortgagee or trustee can give notice of and conduct a sale pursuant to the provisions of this Article"); *In re Hackley*, 713 S.E.2d 119, 120-21 (N.C. Ct. App. 2011) (describing an "Order in Foreclosure" as "permitting the trustee to proceed with the foreclosure sale"). Moreover, Defendant Homeward's action giving rise to Plaintiff's injury was not just allowing the Substitute Trustee to go forward with the sale authorized by the clerk; if it was, that surely would come within the narrow confines of the *Rooker-Feldman* doctrine. Rather, it was Defendant Homeward's act of affirmatively telling Plaintiff that no sale was scheduled and that no sale would take place pending her application to modify her mortgage, and then allowing the sale to go forward with no other notice to Plaintiff. Given these facts, the court cannot say that Plaintiff complains of an injury caused by a state court judgment.[5]

---

[5] In this same manner, placement of the property into a constructive trust would appear, at first glance, to "undo" the state court order permitting the foreclosure sale. In this court's view, however, the imposition of an equitable remedy to address a wrong allegedly inflicted by a defendant *separate* from the state court order does not "reverse or modify" the state court order permitting the foreclosure sale. *See Adkins v. Rumsfeld*, 464 F.3d 456, 464 (4th Cir. 2006) ("[T]he test is not whether the relief sought in the federal suit

12

## b. Res Judicata

Defendants' argument that Plaintiff is attempting to re-litigate issues that have already been judicially determined by the North Carolina state court appears to implicitly argue that portions of the Complaint are subject to the affirmative defenses relating to preclusion. The court, therefore, will address whether the affirmative defense of res judicata, or claim preclusion, precludes Plaintiff from seeking relief in the form of a constructive trust or an injunction.

"The Full Faith and Credit Act, 28 U.S.C. § 1738, originally enacted in 1790, ch. 11, 1 Stat. 122, requires the federal court to 'give the same preclusive effect to a state-court judgment as another court of that State would give.'" *Exxon*, 544 U.S. at 293 (quoting *Parsons Steel, Inc. v. First Ala. Bank*, 474 U.S. 518, 523 (1986)). Under North Carolina law, the doctrine of res judicata applies to bar re-litigation of "every point which properly belonged to the subject in litigation and which the parties, [e]xercising reasonable diligence, might have brought forward . . . ." *Painter v. Ballenger*, 288 N.C. 165, 172, 217 S.E.2d 650, 655 (1975) (quotation omitted). In this case, Defendants argue that "Plaintiff's allegations essentially are an attempt to relitigate the state clerk's decision to allow the foreclosure sale of the property." Mem. [DE-15] at p. 7. That is, Defendants suggest that Plaintiff's allegations should have been raised within the context of North Carolina's statutory foreclosure framework, and her failure to do so precludes her from seeking relief in the form of a constructive trust or injunction in this action.

To evaluate Defendants' argument, it is first necessary to review the process for foreclosure

---

would certainly upset the enforcement of a state court decree, but rather whether the relief would 'reverse or modify' the state court decree." (citing *Exxon*, 544 U.S. at 284) (other quotation marks omitted)).

13

of real property through a power of sale provision in a deed of trust.[6] As Chief United States District

Judge James C. Dever has summarized:

> Under North Carolina law, foreclosure pursuant to a power of sale requires a hearing before the clerk of superior court to determine four issues: (1) the existence of a valid debt; (2) the existence of a default; (3) the trustee's right to foreclose; and (4) the sufficiency of notice to the record owners. If the clerk of court finds a factual basis supporting each item, the clerk may authorize the trustee under the deed to proceed pursuant to the power of sale contained in the deed. Issues that the clerk of court decides at a foreclosure hearing as to the validity of the debt and the trustee's right to foreclose are subject to res judicata and cannot be relitigated in an action for strict judicial foreclosure. A party may appeal decisions of the clerk of court to the superior court, where they are reviewed de novo. In conducting its review, the superior court may consider evidence of legal defenses tending to negate any of the four findings required under N.C. Gen. Stat. § 45-21.16. The review is limited to these four findings, and the superior court has no equitable jurisdiction to enjoin foreclosure on any ground other than the ones stated in N.C. Gen. Stat. § 45-21.16.
>
> On the other hand, a party may raise equitable defenses in a separate action to enjoin the foreclosure sale. Section 45-21.34 provides that "[a]ny owner of real estate . . . may apply to a judge of the superior court, prior to the time that the rights of the parties to the sale or resale becoming fixed . . . to enjoin such sale . . . upon any . . . legal or equitable ground which the court may deem sufficient." The rights of the trustee of the Notes (as seller) become fixed at the expiration of a ten-day period for the filing of upset bids. At that point, the debtor loses its rights to the equity of redemption.

*Merrill Lynch Bus. Fin. Servs., Inc. v. Cobb*, No. 5:07CV129-D, 2008 WL 6155804, at \*\*3-4

(E.D.N.C. Mar. 18, 2008) (internal citations omitted).

Applying North Carolina law, Chief Judge Dever determined that in an action to recover a

deficiency judgment following a foreclosure by sale, the defendants were precluded from challenging

the validity of the debts owed under the notes. *Id.* at \*4. He reasoned that the defendants failed to

---

[6] In North Carolina, the foreclosure of real property can be effected through either a judicial action or through a power of sale provision in a deed of trust. *See United Carolina Bank v. Tucker*, 99 N.C. App. 95, 97, 392 S.E.2d 410, 411 (1990) (explaining the two methods of foreclosure in North Carolina). It is undisputed that foreclosure in this instance was effected through a power of a sale provision in a deed of trust, so the court only addresses the statutory provisions relating to foreclosures by power of sale.

present evidence concerning the validity of the notes at the foreclosure hearings before the superior court clerk, failed to appeal the orders of foreclosure to the superior court within the requisite time period, and failed to file a separate action in superior court to enjoin the foreclosure sales on equitable grounds. *Id.* Courts in the Middle and Western Districts of North Carolina have reached similar conclusions, and the Fourth Circuit Court of Appeals has affirmed the decision of the Western District of North Carolina in an unpublished, per curiam decision. *SunTrust Mortg., Inc. v. Busby*, Nos. 2:09CV03, 2:09CV04, 2:09CV06, 2:09CV07, 2:09CV08, 2:09CV09, 2:09CV10, 2:09CV11, 2:09CV12, 2:09CV13, 2:09CV14, 2:09CV15, 2010 WL 3945103, at \*\*4-5 (W.D.N.C. Oct. 6, 2010) (concluding that defendants were precluded from raising waiver and estoppel in actions to recover deficiency judgments because they could have raised the defenses by filing an application to enjoin the foreclosure sale pursuant to N.C. Gen. Stat. § 45-21.14), *aff'd*, 469 F. App'x 205, 207 (4th Cir. 2012) ("Both § 45-21.16 and § 45-21.34 are parts of a coherent statutory framework intended to preserve the limited rights of a mortgagor subject to a power of sale foreclosure. . . . To permit challenges to the validity of the default outside this framework would defeat the legislative intent behind the North Carolina statutory scheme."); *see Brumby, Jr. v. Deutsche Bank Nat'l Trust Co.*, No. 1:09CV144, 2010 WL 3219353 (M.D.N.C. Aug. 13, 2010) (adopting the magistrate judge's report and recommendation).

Here, however, Plaintiff's state-law claims in no way challenge any of the findings made by the clerk of court, nor could the allegations be raised on appeal from the clerk's order to a superior court judge. *See In re Helms*, 55 N.C. App. 68, 71, 284 S.E.2d 553, 555 (1981) ("According to G.S. 45-21.16, however, there are only four issues before the clerk at a foreclosure hearing: the existence of a valid debt of which the party seeking to foreclose is the holder, the existence of default, the

15

trustee's right to foreclose, and the sufficiency of notice to the record owners of the hearing. The clerk's findings are appealable to the Superior Court within ten days for a hearing *de novo*, but the court's authority is likewise limited."). Moreover, even if this court assumes that Plaintiff's claims represent equitable defenses which could be asserted in an application filed pursuant to N.C. Gen. Stat. § 45-21.34, the facts as alleged in the Complaint show that Plaintiff was unaware–due to Defendant Homeward's representations to the contrary–that the foreclosure sale took place until after the time for filing such an application had expired. In the Fourth Circuit's decision in *Busby*, the court specifically noted that "we are not persuaded that Appellants were effectively barred from filing an action pursuant to § 45-21.34." 469 F. App'x at 207. This statement suggests that if a litigant were able to show that she was effectively barred from filing an action pursuant to § 45-21.34, then res judicata would not preclude her from asserting a later claim or defense which could have been raised in a proceeding pursuant to the statute. Here, the facts as alleged by Plaintiff suggest she was barred from filing an action pursuant to § 45-21.34 because of Defendant Homeward's misrepresentations. Accordingly, the court does not find that Plaintiff's failure to utilize North Carolina's statutory procedures to challenge the foreclosure or foreclosure sale precludes her from asserting her claims.

Defendants, nevertheless, argue that Plaintiff could have filed an action in state court to set aside the sale for equitable reasons, even after the time periods set forth in § 45-21.16 and § 45-21.34 had expired. It is true that the North Carolina Supreme Court has held that a mortgagor may attack a foreclosure proceeding in an independent action, and such an action will only be successful if the mortgagor shows there was a material irregularity in the foreclosure sale and an inadequate purchase price. *See Swindell v. Overton*, 310 N.C. 707, 713, 314 S.E.2d 512, 516 (1984). It does not appear

16

to the court, however, that the potential of such an equitable action means that claims against a mortgagee seeking relief in the form of a constructive trust or injunction are therefore barred under the doctrine of res judicata. Without further argument from the Defendants on this issue, the court declines to dismiss Plaintiff's claims for relief for a constructive trust or injunction pursuant to any preclusion doctrine.

## 2. Plaintiff's Claims

The court will now turn to Defendants' argument that Plaintiff's various causes of action should be dismissed pursuant to Rule 12(b)(6) for failure to state a claim.

### a. Breach of Covenant of Good Faith and Fair Dealing

In Plaintiff's first claim, she alleges that Defendants had an implied duty to act in good faith in the performance of the contractual obligations set forth in the May 23, 2006, Note and Deed of Trust,[7] as well as the SPA. Plaintiff also alleges that Defendant Homeward had a statutory duty to act in good faith in the servicing of the mortgage loan, pursuant to the Secure and Fair Enforcement Mortgage Licensing Act ("SAFE Act"), N.C. Gen. Stat. § 53-244.010 et seq., and its predecessor, the Mortgage Lending Act ("MLA"), N.C. Gen. Stat. § 53-243.01 et seq. (repealed 2009).[8] Plaintiff alleges Defendant Homeward breached its duty to act in good faith when it: (1) gave her false information regarding the loss mitigation process and the pending sale of her home; (2) sold

---

[7] Plaintiff, at times, refers to the "May 6, 2006" loan. Such references appear to implicate the May 23, 2006, Note and Deed of Trust attached to the Complaint.

[8] It is not entirely clear which act would apply in this case. The alleged contract was executed in 2006, before the repeal of the MLA, but the alleged breach of duty of good faith occurred in 2012. *See Dallaire v. Bank of Am.*, N.A., -- S.E.2d --, 2012 WL 6587598, at **4-5 (N.C. Ct. App. Dec. 18, 2012) (noting that when the SAFE Act was enacted in 2009, the "legislature expressed clear intent that it be applied prospectively"). For purposes of the Motion to Dismiss, however, such a ruling is not required.

17

plaintiff's home at foreclosure despite assurances to the contrary; (3) failed to follow several HAMP policies and procedures concerning a servicer's obligations; and (4) failed to act in good faith to remedy the alleged dispute or to respond timely to Plaintiff's requests to investigate and resolve the matter.

Defendants argue that Plaintiff's claim for breach of the duty of good faith and fair dealing fails to state a claim for several reasons. First, Defendants contend that, to the extent that Plaintiff's claims are predicated on alleged violations of HAMP policies and procedures, her claim must be dismissed because she is impermissibly asserting a right to a private action that does not exist under HAMP. Second, Defendants argue that Plaintiff fails to allege facts showing she has the requisite standing or that Defendants breached any contract between them and her. Finally, Defendants argue that any statutory claim for breach of the duty of good faith and fair dealing owed by servicers to borrowers must fail.

### i. No private right of action under HAMP, but no preemption

Defendants argue, and Plaintiff concedes, that there is no express or implied private right of action under HAMP.[9] *See, e.g.*, *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 559 n.4 (7th Cir.

---

[9] As one district court has described:

> On October 8, 2008, President Bush signed into law the Emergency Economic Stabilization Act of 2008, Pub.L. No. 110–343, 122 Stat. 3765 (codified 12 U.S.C. § 5201 et seq.) ("EESA"). Section 109 required the Secretary of the Treasury ("the Secretary") to take certain measures in order to encourage and facilitate loan modifications. . . . The EESA authorized the Secretary of the Treasury, FHFA, Fannie Mae, and Freddie Mac to create the Making Home Affordable Program on February 18, 2009, which consists of two components: (1) the Home Affordable Refinance Program, and (2) the HAMP. The HAMP aims to financially assist three to four million homeowners who have defaulted on their mortgages or who are in imminent risk of default by reducing monthly payments to sustainable levels.
>
> The HAMP works by providing financial incentives to participating mortgage servicers to

2012) (observing that courts have uniformly rejected claims asserting rights arising under HAMP itself "because HAMP does not create a private federal right of action for borrowers against servicers"); *Summers v. Ocwen Loan Serv., LLC*, No. 2:10CV565, 2011 WL 8129475, at *1 (E.D. Va. Feb. 11, 2011) ("[F]ederal courts have repeatedly recognized that a private right of action against a lender is neither expressly no[r] implicitly created by either the federal statute authorizing HAMP or by HAMP regulations or guidelines."). Working from this proposition, Defendants argue Plaintiff "cannot attempt to create a private right of action under HAMP where none exists," *see* Mem. [DE-15] at p. 12, and that any state law claims which are premised upon Defendants' failure to follow HAMP policies must be dismissed.

Some courts within this circuit, particularly those within the Eastern District of Virginia, have been receptive to similar arguments. *See, e.g., Monton v. Am. 's Serv. Co.*, No. 2:11CV678, 2012 WL 3596519, at **8-9 (E.D. Va. Aug. 20, 2012) (dismissing various state-law causes of action because, *inter alia*, the claims were "nothing more than an attempt to couch a HAMP violation–which provides no private right of action–under a different name"). Other courts within this circuit, notably the District of Maryland, have refused to conclude that "just because HAMP does not create a private a right of action, all common law claims based on violations of the HAMP guidelines should be summarily dismissed." *Legore v. OneWest Bank, FSB*, -- F. Supp. 2d --, 2012 WL 4903087, at *4 (D. Md. Oct. 15, 2012) (agreeing that HAMP does not create a private right of action, but observing that "this does not mean that defendants are wholly immunized for their

modify the terms of eligible loans.

*Marks v. Bank of Am., N.A.*, No. 03:10CV08039-PHX-JAT, 2010 WL 2572988, at *5 (D. Ariz. June 22, 2010) (citations omitted).

Case 5:12-cv-00590-F Document 20 Filed 04/09/13 Page 19 of 41

conduct so long as the subject of the transaction is associated with HAMP") (quotation omitted). Additionally, the Seventh Circuit Court of Appeals, in a well-reasoned opinion, discussed at length why the argument proffered by Defendants here–that state-law claims amounting to "HAMP claims in disguise" are an "impermissible end-run around the lack of a private action in . . . HAMP"–itself is "really just an 'end-run' around well-established preemption doctrine." *Wigod*, 673 F.3d at 581, 584. This court believes the Seventh Circuit and the courts in the District of Maryland present the better view. For the same reasons stated by the Seventh Circuit in *Wigod*, this court concludes that Defendants' "end-run" theory is without merit. *See id.* at 581 ("The absence of a private right of action from a federal statute provides no reason to dismiss a claim under a state law just because it refers to or incorporates some element of the federal law."). Accordingly, the court will further examine the Complaint to determine whether Plaintiff sufficiently alleges a cognizable claim.

## ii. Covenant of good faith

Under North Carolina law, a covenant of good faith and fair dealing is implied in every contract. *Bicycle Transit Auth. v. Bell*, 314 N.C. 219, 228, 333 S.E.2d 299, 305 (1985). Under this implied covenant, it is understood that "neither party will do anything which injures the right of the other to receive the benefits of the agreement." *Id.* (quotation omitted). Accordingly, "[a]ll parties to a contract must act upon principles of good faith and fair dealing to accomplish the purpose of an agreement, and therefore each has a duty to adhere to the presuppositions of the contract for meeting this purpose." *Maglione v. Aegis Family Health Ctrs.*, 168 N.C. App. 49, 56, 607 S.E.2d 286, 291 (2005).

Defendants first argue that North Carolina law does not recognize a stand-alone cause of action for breach of the implied covenant of good faith and fair dealing, and because Plaintiff does

20

not allege that Defendants breached a valid contract she cannot state a claim. Defendants are correct to that extent they argue that Plaintiff must be a party or a beneficiary to a valid contract in order to assert a claim for breach of the implied covenant of good faith and fair dealing. *See id.* (recognizing "the 'basic principles of contract law that a party who enters into an enforceable contract is required to act in good faith and to make reasonable efforts to perform his obligations under the agreement'") (quoting *Weyerhaeuser Co. v. Godwin Building Supply Co.*, 40 N.C. App. 743, 746, 253 S.E.2d 625, 627 (1979)). However, Plaintiff alleges in the Complaint (and makes clear in her response to the Motion to Dismiss), that Defendants breached their duty to act in good faith in the performance of the contractual obligations set forth in the May 23, 2006, Note and Deed of Trust.[10]

Moreover, North Carolina law is unclear with regard to the remainder of Defendants' argument. First, the case Defendants cite for their assertion that North Carolina does not recognize a stand-alone action for breach of the implied covenant of good faith and fair dealing, *Mechanical Industries v. O'Brien/Atkins Assocs. P.A.*, No. 1:97CV00099, 1998 U.S. Dist. LEXIS 5389 (M.D.N.C. Feb. 4, 1998), did not so hold. Rather, *Mechanical Industries* stated that "North Carolina

---

[10] Plaintiff also alleges that Defendants had "an implied duty to act in good faith in the perfomance of the contractual obligations set forth in . . . the [SPA], to which all banks electing into HAMP must agree." Compl. ¶ 65. It appears from her response in opposition to the Motion to Dismiss, however, that Plaintiff no longer pursues this theory. In any event, the court agrees with the overwhelming majority of courts that mortgagors are not parties to, nor third party beneficiaries of, SPAs entered into between mortgage servicers and the federal government. *See, e.g.*, *Correll v. Bank of Am., N.A.*, No. 2:11CV477, 2012 WL 348594, at *4 (E.D. Va. Feb. 2, 2012) (rejecting a plaintiff's breach of implied covenant of good faith claim because the plaintiff was not an intended beneficiary of the SPA and collecting cases for the proposition that courts have "uniformly rejected the contention that individuals have a right to sue as third-party beneficiaries to contracts between mortgage providers and Fannie Mae"). This does not mean, however, that evidence of Defendants' alleged violation of the SPA would be irrelevant to Plaintiff's claim that Defendants did not act in good faith. *See Hinson v. Countrywide Home Loans, Inc.*, 481 B.R. 364, 379-80 (Bankr. E.D.N.C. 2012) (refusing to address whether a violation of a SPA would create a third-party action, but observing that violation of SPA-imposed duties during the time a plaintiff was seeking a HAMP modification could serve as further evidence of a defendant's lack of good faith and fair dealing).

recognizes an action for breach of an implied duty of good faith and fair dealing in limited circumstances involving special relationships between parties, e.g., cases involving contracts for funeral services and insurance" and that "[o]utside such circumstances, actions for breach of good faith fail."[11] *Id.* at *11. Second, although various federal district courts have stated that where a breach of contract claim and breach of implied covenant claim are based on the same facts, they should be considered together, the court has not identified a North Carolina state court case holding that a plaintiff must allege that a specific contractual provision has been breached in order to maintain a breach of implied covenant claim. *See, e.g.*, *B. Lewis Prods., Inc. v. Angelou*, No. 01CIV0530-MBM, 2005 WL 1138474, at *11 (S.D.N.Y. May 12, 2005) ("[T]he weight of North Carolina authority holds also that a claim for breach of the covenant of good faith and fair dealing based on facts identical to those supporting a breach of contract claim should not be pursued separately."). Indeed, the only North Carolina appellate case found by the court to address the issue head-on stated that it had *not* held "that a party must allege a breach of contract to state a claim for breach of the duty of good faith and fair dealing." *Richardson v. Bank of Am., N.A.*, 182 N.C. App. 531, 556, 643 S.E.2d 410, 426 (2007) ("*Polygenex Int'l, Inc.* [*v. Polyzen, Inc.*, 133 N.C. App. 245, 515 S.E.2d 457 (1999)] does not stand for the proposition that a party alleging breach of the duty of good faith and fair dealing must allege a breach of contract."). The fact that Plaintiff does not allege

---

[11] This statement, itself, appears to be an incorrect over-generalization of various North Carolina state appellate cases. *See Mech. Indus.*, 1998 U.S. Dist. LEXIS 5389 at *11 (citing *Hogan v. City of Winston-Salem*, 121 N.C. App. 414, 466 S.E.2d 303 (1996); *Allman v. Charles*, 111 N.C. App. 673, 433 S.E.2d 3 (1993); *Claggett v. Wake Forest Univ.*, 126 N.C. App. 602, 486 S.E.2d 443 (1997); *Philips v. J.P. Stevens & Co.*, 827 F. Supp. 349 (M.D.N.C. 1999). The court's review of the cases cited by *Mechanical Industries* leads it to conclude that at most, the statement can be made that North Carolina does not recognize a separate exception to employment at will on the basis of a violation of an implied covenant of good faith, *see Phillips*, 827 F. Supp. at 352 (citing *Amos v. Oakdale Knitting Co.*, 331 N.C. 348, 358-59, 416 S.E.2d 166, 173 (1992)). The other cases cited by *Mechanical Industries* may have found that the facts did not support an implied breach of the covenant of good faith, but they did not announce any "limited circumstances" rule.

a breach of a specific provision of the Note or Deed of Trust does not, therefore, doom her claim.

Defendants next argue that they had the express right to foreclose under the Deed of Trust upon Plaintiff's default. This, according to Defendants, coupled with the fact that there is no express obligation in either the Note or Deed of Trust to grant her a loan modification, also means Defendants cannot be held liable for breach of the covenant of good faith and fair dealing. This court, however, agrees with the sentiments of the District Court for the Southern District of West Virginia, who rejected a similar argument by a mortgage holder, remarking that the "line of argument is, frankly a strawman." *Koontz v. Wells Fargo, N.A.*, No. 2:10CV864, 2011 WL 1297519, at \*8 (S.D. W. Va. Mar. 31, 2011). Like the court in *Koontz*, the court finds that Plaintiff is not advancing the theory that Defendants are arguing against: that the simple act of foreclosing and not modifying a loan gives rise to a breach of implied duty of good faith claim. Rather, like the plaintiff in *Koontz*, Plaintiff in this case contends that in exercising its discretion under the loan agreements to foreclose or modify, Defendants were confined by the covenant of good faith and fair dealing to act toward her in a commercially reasonable manner. Moreover, Plaintiff alleges that Defendants: (1) provided her with false information about the loss mitigation process; (2) informed her that no foreclosure was scheduled; and (3) instructed her that no foreclosure sale would take place while her application was pending, but then proceeded to allow the foreclosure sale to go forward. All of these are sufficient acts which may amount to bad faith, and such allegations are sufficient to state a claim for breach of the covenant of good faith and fair dealing under North Carolina law.

Defendants' final argument against Plaintiff's claim is that she, in fact, received the benefits of her existing loan agreements, in that she was loaned the funds to used to purchase her residence. They reiterate that they had the explicit right to foreclose under the agreements. Again, however, the

23

court believes Defendants miss the mark. Although Plaintiff received funds under the agreements to purchase her home, the eventual foreclosure of her property "goes to the very essence of the benefit which the plaintiff[] sought by entering into [her] existing mortgage contract with the defendants." *Hinson*, 481 B.R. at 379. Moreover, Plaintiff is not arguing that she had a "right" for Defendants "not to foreclose." Reply [DE-19] at p. 3 (arguing that "Plaintiff had no right for Defendants *not* to foreclose, and she cannot establish that she was deprived of any benefit under the agreements"). Rather, she is arguing that Defendants, in exercising their right to choose to modify her loan or foreclose upon the property, had to do so in a reasonable manner in keeping with the expectations of the parties. By telling Plaintiff that no foreclosure sale would take place pending their review of her application to modify the loan, Defendants altered the expectations of the parties. *See Rapacki v. Chase Home Fin., LLC*, No. 3:11CV185-HZ, 2012 WL 1340119, at *9 (D. Or. Apr. 17, 2012) (allowing a breach of the implied duty of good faith claim under Oregon law to go forward because the defendant's actions in telling the plaintiff, *inter alia*, that during the processing of the loan modification paperwork the defendant would abstain from foreclosing, created an obligation on defendant to actually stay foreclosure). By then proceeding with the foreclosure sale a few days later, a jury could find that Defendants violated the implied covenant of good faith and fair dealing. *See id.*

The court concludes, therefore, that Plaintiff alleges sufficient facts to survive a motion to dismiss. The court notes that Plaintiff's facts are not wholly dependent upon any alleged violations of HAMP, and the court declines to rule at this juncture as to whether evidence of any HAMP violations are relevant to Plaintiff's claim.

### iii. Statutory claim

24

Plaintiff contends that she has a "statutory claim" for breach of the duty of good faith and fair dealing against Defendants. In so arguing, she apparently relies on the SAFE Act, which provides, in part, as follows:

> In the event of a delinquency or other act of default on the part of the borrower, the mortgage servicer shall act in good faith to inform the borrower of the facts concerning the loan and the nature and extent of the delinquency or default and, if the borrower replies, to negotiate with the borrower, subject to the mortgage servicer's duties and obligations under the mortgage servicing contract, if any, to attempt a resolution or workout to the delinquency.

N.C. Gen. Stat. § 53-244.110(7). She also apparently relies on the MLA, which similarly prohibits lenders from engaging "in any transaction, practice, or course of business that is not in good faith or fair dealing or that constitutes a fraud," or failing "to comply with applicable State and federal laws and regulations related to mortgage lending or mortgage servicing." N.C. Gen. Stat. §§ 53-243.11(8), (14) (repealed 2009).

To the extent that Plaintiff is arguing that she has a statutory private right of action under the SAFE Act or the MLA, she is incorrect.[12] Neither act expressly creates a private right of action. *See Lea v. Grier*, 156 N.C. App. 503, 508, 577 S.E.2d 411, 415 (2003) (explaining that North Carolina cases generally hold "that a statute allows for a private cause of action only where the legislature has expressly provided a private cause of action within the statute" (quotation omitted)). The court otherwise declines to rule at this juncture whether evidence that Defendants violated the SAFE Act or the MLA is relevant to Plaintiff's breach of the implied covenant claim.

Because Plaintiff alleges sufficient facts to sustain her common law breach of the implied covenant of good faith and fair dealing claim, the motion to dismiss her first claim for relief will be

---

[12] Plaintiff does not appear to argue that there exists an implied private right of action.

DENIED.[13]

## b. Constructive Fraud

In Plaintiff's second claim, she alleges that all Defendants are liable for constructive fraud. To state such a claim, a plaintiff must allege facts and circumstances which show the existence of a confidential or fiduciary relationship, "which has led up to and surrounded the consummation of the transaction in which defendant is alleged to have taken advantage of his position of trust to the hurt of plaintiff." *Forbis v. Neal*, 361 N.C. 519, 528, 649 S.E.2d 382, 388 (2007) (quotation omitted); *see also Searcy v. Searcy*, 715 S.E.2d 853, 857 (N.C. Ct. App. 2011) (stating the elements of constructive fraud claim to be: "(1) the existence of a fiduciary duty, and (2) a breach of that duty" (quotation omitted)). Defendants argue that Plaintiff's claim for constructive fraud must be dismissed because, as a matter of law, there was no confidential or fiduciary relationship between Plaintiff and either Defendant.

Courts have been reluctant to articulate a definition for either a confidential or fiduciary relationship, but it generally can be said that one "'exists in all cases where there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence.'" *Terry v. Terry*, 302 N.C. 77, 84, 273 S.E.2d 674, 678 (1981) (quoting *Abbitt v. Gregory*, 201 N.C. 577, 598, 160 S.E. 896, 906 (1931)). North Carolina courts have recognized two types of fiduciary relationships: "'(1) those that arise from legal relations such as attorney and client, broker and client . . . partners, principal and agent, trustee and cestui que trust,' and (2) those that exist 'as a fact, in which there is confidence reposed

---

[13] The parties' arguments as to Plaintiff's "alternative" first claim for relief are discussed in the court's ruling on Defendants' motion to dismiss Plaintiff's fourth claim.

on one side, and the resulting superiority and influence on the other.'" *S.N.R. Mgmt. Corp. v. Danube Partners 141, LLC*, 189 N.C. App. 601, 613, 659 S.E.2d 442, 451 (2008) (quoting *Rhone-Poulenc Agro S.A. v. Monsanto Co.*, 73 F. Supp. 2d 540, 546 (M.D.N.C. 1999)) (alteration in original).

Plaintiff appears to argue that she has the first type of fiduciary relationship with Defendants, one that arises by legal relation and is presumed by the law. Specifically, she asserts that "North Carolina recognizes that the relationship of mortgagor and mortgagee creates a fiduciary [relationship] as a matter of law." Resp. [DE-17] at p. 16 (citing *Carroll v. Rountree*, 36 N.C. App. 156, 158, 243 S.E.2d 821, 822 (1978)). The court, however, agrees with Defendants that Plaintiff has overstated North Carolina law on this issue. Plaintiff admits that the case she cites for her assertion, *Carroll*, only stated in dicta that a "known and definite" fiduciary relationship exists between a "mortgagor and mortgagee in transactions affecting the mortgaged property." 36 N.C. App. at 158, 243 S.E.2d at 822. The case on which *Carroll* apparently relies for support for this assertion is *Hinton v. West*, 207 N.C. 708, 178 S.E. 356 (1935). In *Hinton*, the defendant, an attorney, gave the plaintiff landowner various items of value ("old clothes, a finger ring, and a 20-gallon soft drink jar"), loaned the plaintiff $300, sold the plaintiff a used car for $475, and paid some taxes for the plaintiff. 207 N.C. at 708, 178 S.E. at 356. In exchange, the defendant made out a note for the same and took a mortgage on 48 acres of land belonging to the plaintiff. *Id.* When the note became due, the defendant threatened foreclosure. *Id.*, 178 S.E. at 356-57. Fearing foreclosure, the plaintiff agreed to forego his equity of redemption. *Id.* The defendant mortgagee prepared, and plaintiff signed in the defendant's law office, a deed of trust from the plaintiff to the defendant in the capacity of trustee for his brother. *Id.*, 178 S.E. at 359. The North Carolina Supreme Court observed that the evidence indicated that plaintiff "was dealing with [the defendant] in the negotiations for the

27

loan and [the defendant], trustee for the sale; that [the defendant] was acting in a dual capacity as trustee and agent for [his brother] and was the primary party to the purchase." *Id.* The court reversed the lower court's judgment of non-suit in favor of the mortgagee, noting that the "evidence indicated that the trustee acted for himself or for the creditor or acted together" in obtaining the conveyance of the equity of redemption from the plaintiff for inadequate consideration. *Id.*, 178 S.E. at 360.

This decision was in keeping with previous decisions of the North Carolina Supreme Court holding that a fiduciary relationship exists where a mortgagee buys the equity of redemption from a mortgagor, *see, e.g.*, *McLeod v. Bullard*, 84 N.C. 515, 1881 WL 3091 (1881), *app'd on reh'g*, 86 N.C. 210, 1882 WL 2757 (1882), and that a trustee of a deed of trust stands in a fiduciary relationship with the debtor and creditor, *see Hinton v. Pritchard*, 120 N.C. 1, 3-4, 26 S.E. 627, 627 (1897) ("In trust deeds for the benefit of creditors, the trustee is the agent of both creditor and debtor, and he is required to discharge his duties with the strictest impartiality, as well as with fidelity, and according to his best ability."). Accordingly, because the evidence in *Hinton* indicated that the trustee was acting in a dual capacity, the burden was on the defendants to show that "the transaction was fair and free from oppression." *Hinton*, 207 N.C. at 708, 178 S.E.2d at 359. This court therefore agrees with the observation of the Western District of North Carolina that subsequent cases citing *Hinton* for the proposition that a fiduciary relationship exists between a mortgagor-mortgagee "extrapolate from that case to a degree not warranted by its holding." *Smith v. GMAC Mortg. Corp.*, No. 5:06CV125-V, 2007 WL 2593148, at *6 n.12 (W.D.N.C. Sept. 5, 2007).[14] Rather, a more sound

---

[14] The *Hinton* case contains the following quote:

> Bigelow, in his work on Fraud, page 160, says, there are certain relations, termed relations

reading of North Carolina cases indicates that, ordinarily, a fiduciary relationship does not exist

between a mortgagor and a mortgagee, but one may exist "as a fact, in which there is confidence

reposed on one side, and the resulting superiority and influence on the other." *S.N.R. Mgmt. Corp.*,

189 N.C. App. at 613, 659 S.E.2d at 451 (quotation omitted); *see also Simpson v. Fry*, 194 N.C. 623,

140 S.E. 295, 297 (1927) ("There is no fiduciary relation between a creditor and his debtor by which

it can be said that the latter is in the power of the former. . . . Nor does the fact that the debtor has

conveyed property to a third person to secure his creditor establish any fiduciary relation between

him and such creditor."); *Murphy v. Taylor*, 214 N.C. 393, 199 S.E. 382, 382 (1938) ("The rule

stated in *Simpson v. Fry* . . . was not changed or modified by the decision in *Hinton v. West* . . . .");

*Dallaire v. Bank of Am., N.A.*, -- S.E.2d --, 2012 WL 6587598, at *3 (N.C. Ct. App. Dec. 18, 2012)

("While uncommon, North Carolina law does leave room for the recognition of a fiduciary

> of confidence, from the existence of which the law raises a presumption of fraud, in any
> dealings that may take place between the parties, because of the undue advantage which the
> situation itself gives to one over the other. Of these 'relations in confidence,' he enumerates
> eight in number, and in the following order: Attorney and client; principal and agent;
> partners; trustees and cestuis que trust; guardian and ward; executors and administrators;
> mortgagor and mortgagee; parent and child. Thus, he places the relation of mortgagor and
> mortgagee with the other well defined and universally acknowledged fiduciary relations.
> Upon principle, this should be so. It is due to good faith and common honesty that such a
> presumption should arise in every case where confidence is reposed, and the property and
> interests of one person are committed to another. To every such person his trust should be
> a sacred charge–not to be regarded with a covetous eye.

*Hinton*, 207 N.C. at 708, 178 S.E.2d at 360 (quoting *McLeod*, 84 N.C. at 531). The *McLeod* case, and those
cases it cited, however, were examining whether a presumption of fraud arises when a mortgagor conveys
his equity of redemption in the land to the mortgagee. *See McLeod*, 86 N.C. 210, 1882 WL 2757. Indeed,
the treatise cited in *McLeod* appears to limit its observations on confidential relations between a mortgagor
and mortgagee to the situation where the mortgagor has conveyed the to the mortgagee the equity of
redemption. *See* MELVILLE M. BIGELOW, THE LAW OF FRAUD AND PROCEDURE PERTAINING TO THE REDRESS
THEREOF 259-60 (1877). This close reading of the cases cited in *Hinton* gives further credence to the court's
conclusion that, outside the purchase of a mortgagor's equity of redemption, North Carolina does not
automatically infer a fiduciary relationship based on the existence of a mortgagor-mortgagee relationship.

29

relationship between lender or borrower.").

Thus, the court must determine if Plaintiff alleges sufficient facts to show that a relationship existed where Plaintiff placed special confidence in Defendant Homeward, who, in equity and good conscience, had to act in good faith and due regard for Plaintiff's interests. This court has identified only one case where a North Carolina state court found allegations sufficient to suggest the possibility of a fiduciary relationship or relationship of "special confidence" between a mortgagor and a mortgagee. *See Dallaire*, 2012 WL 6587598. In *Dallaire*, the mortgagor plaintiffs filed for Chapter 7 bankruptcy, and through those proceedings, were relieved of their personal liability on three mortgage liens held against their home. Mortgagee defendant Bank of America held two of these liens, including a deed of trust on a mortgage note in first priority status. Bank of America subsequently mailed solicitations for refinancing home mortgages to the plaintiffs, who met with a Bank of America agent to discuss refinancing options. The plaintiffs alleged they fully informed Bank of America's agent about their bankruptcy and the remaining liens, and that the agent "repeatedly assured them that a new refinancing loan would receive first priority status and advised them to increase the amount of the loan to pay off two car notes." *Id.* at *1. The plaintiffs alleged they relied on this assurance and advice, and without seeking outside counsel they applied for a refinancing loan. Three years later, the plaintiffs attempted to sell their home, and upon conducting a title search, discovered that the lien from the refinanced mortgage held second priority, contrary to Bank of America's assurances. The trial court granted summary judgment to Bank of America on the plaintiffs' breach of fiduciary claim. However, the North Carolina Court of Appeals, in reversing the trial court's grant of summary judgment, found that there was "a question of fact as to whether or not the circumstances of the parties' interaction prior to signing the loan [gave] rise to

a fiduciary relationship and consequently created a fiduciary duty for Defendant." *Id.* at \*4. In a footnote, the court of appeals specifically stated that "a question of fact exists as to whether or not [d]efendant sought to give legal advice to [p]laintiffs" and that "when a financial institution undertakes to provide a customer with a service beyond that inherent in the creditor-debtor relationship, it must do so reasonably and with due care." *Id.* at \*4 n.5.

The United States District Court for the Western District of North Carolina has also concluded that a plaintiff mortgagor alleged sufficient facts to survive a defendant mortgagee's motion to dismiss a fiduciary duty claim. *See Smith*, 2007 WL 2593148. In *Smith*, the deed of trust required the institution of an escrow account, to be managed by the mortgagee, for the maintenance of ad valorem taxes and homeowners' insurance on the mortgaged property. The mortgagee failed to pay insurance premiums out of the escrow account, resulting in the cancellation of the mortgagor's homeowners' insurance on the mortgaged property. The mortgagee subsequently obtained another insurance policy for the mortgagor, resulting in a much higher premium, which in turn resulted in the foreclosure on the plaintiff's home, damage to her credit score, and the incurrence of various expenses. The Western District found that under these circumstances, where the plaintiff mortgagor alleged that she had placed her trust and confidence in the mortgagee to receive and process her payments in escrow as agreed, and where the mortgagee was in the unique position of controlling when and how the escrow funds would be disbursed, a jury "could find that the circumstances surrounding the mortgager-mortgagee relationship between [p]laintiff and [d]efendant created a fiduciary duty through the obligations of trust, confidence and good faith." *Id.* at \*9. The court specifically noted that because the mortgagee was exclusively responsible for the payment of the insurance premiums and because the plaintiff's homeowner's insurance was billed directly to the

31

mortgagee, "a reasonable juror could determine that [the defendant] possessed sufficient control, direction, and influence over [p]laintiff's interests." *Id.* at \*7.

Here, unlike in *Dallaire* or in *Smith*, the court finds that Plaintiff has not alleged facts showing that a fiduciary relationship existed between her and Defendant Homeward. In contrast to *Dallaire*, in this case there is no indication that Defendant Homeward undertook to provide Plaintiff with a service beyond that inherent in the creditor-debtor relationship. Rather, the loan modification process is "an arm's length transaction between service and borrower, no less than is a home mortgage itself." *Wigod*, 673 F.3d at 573 (concluding that "[l]ike the original mortgagor-mortgagee relationship itself, the relevant aspects of the HAMP servicer-borrower relationship do not bear the fiduciary-like hallmarks of a special trust relationship under Illinois law").[15]

The facts in this case are also distinguishable from *Smith*. The court agrees with Defendants that the nature of the mortgagor-mortgagee relationship with regard to a loan modification differs significantly from the aspects of the relationship with regard to the maintenance of an escrow account. In the latter, the mortgagee acts as an agent for the mortgagor, and thus, the mortgagor can be deemed as placing a special confidence in the mortgagee with regard to the maintenance of the escrow account; the mortgagee, in turn, is charged with acting in the best interests of the mortgagor. The former, however, remains an arms-length transaction between the parties, where it cannot be said that the mortgagee is charged, under the law, with acting with due regard to mortgagor's interests.

---

[15] The court finds the *Wigod* decision particularly informative because Plaintiff quotes a case discussing factors examined under Illinois law to determine whether a fiduciary duty or relationship of special confidence exists. *See* Resp. [DE-17] at p. 16 (quoting *Rhone-Poulenc*, 73 F. Supp. 2d at 546 (listing factors in determining whether a fiduciary relationship exists under Illinois law)).

Accordingly, because Plaintiff has failed to allege sufficient facts to show that her relationship with Defendants differs from the typical debtor-creditor relationship, Defendants' Motion to Dismiss will be ALLOWED and her claim for constructive fraud will be DISMISSED.

### c. Gross Negligence

In Plaintiff's third claim for relief, she alleges that Defendants are liable for gross negligence. Specifically, she alleges that Defendant Homeward owed a duty of care to her to manage properly applications for loss mitigation, and to monitor, update, and manage the foreclosure action it initiated on behalf of Defendant Deutsche Bank. Compl. ¶¶ 80-81. She alleges that Defendant Homeward "willfully, wantonly, or with reckless disregard, breached" these duties when it failed "to impose proper tracking systems to track the status of Plaintiff's application for a loan modification," to provide her "with accurate information about the status of the foreclosure of her home," and "to take timely action in response to Plaintiffs' dispute regarding the sale of her home." Compl. ¶ 82. Plaintiff alleges that Defendant Deutsche Bank is liable for these violations because Homeward was acting as its agent. Defendants move to dismiss the claim, contending, *inter alia*, that Defendants owed Plaintiff no duty beyond what was specified in the various loan documents.

To state a claim for negligence, "a plaintiff must allege: (1) a legal duty; (2) a breach thereof; and (3) injury proximately caused by the breach." *Stein v. Asheville City Bd. of Educ.*, 360 N.C. 321, 328, 626 S.E.2d 263, 267 (2006) (citation omitted). "An act or conduct rises to the level of gross negligence when the act is done purposely and with knowledge that such act is a breach of duty to others, i.e., a conscious disregard of the safety of others." *Yancey v. Lea*, 354 N.C. 48, 53, 550 S.E.2d 155, 158 (2001) (emphases omitted). When a claim for negligence or gross negligence has been asserted, the court must first determine, as a matter of law, whether the defendant owed a duty

33

of care to the plaintiff. *Stein*, 360 N.C. at 328, 626 S.E.2d at 267 (explaining that the threshold question is whether a plaintiff adequately alleges defendants owed her a cognizable legal duty). "If no duty exists, there logically can be neither breach of duty nor liability." *Harris v. Daimler Chrysler Corp.*, 180 N.C. App. 551, 555, 638 S.E.2d 260, 265 (2006) (citation omitted).

With regard to the legal duty owed by a lender or mortgage servicer to a borrower, the North Carolina Court of Appeals has stated as follows:

> A duty of care, supporting a negligence claim, may arise out of a contractual relationship. For this reason, this Court has acknowledged that a lender has a duty to perform those responsibilities specified in a loan agreement, but has declined to impose any duty beyond those expressly provided for in the agreement.

*Wagner v. Branch Banking & Trust Co.*, 179 N.C. App. 436, 634 S.E.2d 273, 2006 WL 2528495, at *2 (Sept. 5, 2006) (citing *Olympic Prods. Co. v. Roof Sys., Inc.*, 88 N.C. App. 315, 322, 363 S.E.2d 367, 371 (1988) ("A duty of care may arise out of a contractual relationship, the theory being that accompanying every contract is a common-law duty to perform with ordinary care the thing agreed to be done, and that a negligent performance constitutes a tort as well as a breach of contract.")); *see also Camp v. Leonard*, 133 N.C. App. 554, 560, 515 S.E.2d 909, 913 (1999) ("[A] lender is only obligated to perform those duties expressly provided for in the loan agreement to which it is a party."); *Perry v. Carolina Builders Corp.*, 128 N.C. App. 143, 150, 493 S.E.2d 814, 818 (1997) ("[I]n the absence of [an] allegation of an express contractual provision between the instant parties requiring [the defendant lender] to ensure application of the loan funds at issue to an agreed purpose, plaintiffs were owed no such legal duty."); *Carlson v. Branch Banking & Trust Co.*, 123 N.C. App. 306, 315, 473 S.E.2d 631, 637 (1996) (finding that a defendant bank owed no duty to monitor the use of loan proceeds absent an express contractual provision so requiring). The North

34

Carolina Court of Appeals in *Wagner* went on to recognize that a "duty may also be imposed if one party undertakes to render services to another and the surrounding circumstances are such that the first party should recognize the necessity to exercise ordinary care to protect the other party or the other party's property; and failure to do such will cause the danger of injury to the other party or the other party's property." 179 N.C. App. 436, 634 S.E.2d 273, 2006 WL 2528495, at *3 (quotation omitted).

In this case, there was no contract to process the loan modification application, and Plaintiff does not allege that Defendants failed to perform any duty specified in the loan documents. Accordingly, despite Plaintiff's arguments to the contrary, the allegations do not support the claim that Defendant Homeward undertook to render some service that is not inherent in the creditor-debtor relationship. To the extent Plaintiff argues that Defendants owed her an extra-contractual legal duty to process, manage, or monitor the loan modification applications or foreclosure, the court finds that Defendants owed Plaintiff no such legal duty to be held liable for negligence under North Carolina law.

However, as with any contract, the alleged May 23, 2006, Note and Deed of Trust imposed upon Defendants a duty to perform the contract with ordinary care. Plaintiff alleges Defendants breached its duty when it affirmatively, but inaccurately, represented that the foreclosure sale would not go forward. Plaintiff adequately alleges that she reasonably relied on this statement, and that such reliance caused her to forego her opportunity to redeem her property through the filing of a Chapter 13 bankruptcy resulting in harm in the form of foreclosure. Accordingly, the court finds that

35

all of the necessary elements of a negligence claim have been satisfied.[16] Therefore, Defendants' motion to dismiss Plaintiff's claim for negligence will be DENIED to the extent it is based on Defendants' breach of a duty of ordinary care imposed by the May 23, 2006, Note and Deed of Trust by making an inaccurate statement that the foreclosure sale would not go forward.

### d. UDTPA Claim

In her fourth claim for relief, Plaintiff alleges that Defendant Homeward engaged in unfair and/or deceptive trade practices in violation of N.C. Gen. Stat. § 75-1.1 by: (1) providing her with a modification which violated HAMP directives; (2) misrepresenting the length of time post-default that Plaintiff had to wait before applying for a loan modification; (3) informing Plaintiff that the foreclosure sale of her home was canceled when it was not; and (4) failing to timely respond and correct problems resulting from the foreclosure after such problems were brought to Homeward's attention. She alleges that Defendant Deutsche Bank is liable for these actions, because Homeward was acting as Deutsche Bank's agent. Additionally, as part of her "alternative" first claim for relief, Plaintiff alleges, *inter alia,* that Homeward failed to follow several HAMP policies and procedures concerning a servicer's obligations, and this also constitutes a violation of N.C. Gen. Stat. § 75-1.1. Defendants argue that Plaintiff's UDTPA claims must be dismissed because: (1) she is attempting to assert a private action where none exists under HAMP; (2) Defendants pursued a right under law (foreclosure), which cannot be considered an unfair or deceptive trade practice or act; and (3) she

---

[16]    North Carolina "expressly recognizes a cause of action in negligence based on negligent misrepresentation." *Hunter v. Guardian Life Ins. Co. of Am.*, 162 N.C. App. 477, 483, 593 S.E.2d 595, 600 (2004) (quotation omitted). Although not asserted, the facts of the Complaint would likely support the elements of a direct negligent misrepresentation cause of action, namely, (1) a party justifiably relies, (2) to his detriment, (3) on information prepared without reasonable care, (4) by one who owed the relying party a duty of care. *Walker v. Town of Stoneville*, 712 S.E.2d 239, 244 (N.C. Ct. App. 2011).

36

cannot show that her alleged damage was proximately caused by Defendants' actions.

North Carolina's UDTPA makes unlawful the use of unfair or deceptive trade practices and provides a cause of action for any person injured by such practices. N.C. Gen. Stat. §§ 75-1.1; 75-16. To state a claim under the UDTPA, a plaintiff must plausibly allege that: (1) the defendant committed an unfair or deceptive act or practice; (2) the act or practice was in or affecting commerce; and (3) the act proximately caused injury to the plaintiff. *Id.*; *Dalton v. Camp*, 353 N.C. 647, 656, 548 S.E.2d 704, 711 (2001). Whether the act is unfair or deceptive is question of law for the court. *Dalton*, 353 N.C. at 656, 548 S.E.2d at 711. An act is unfair "when it offends established public policy[,] . . . is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers," or "amounts to an inequitable assertion of . . . power or position." *Carcano v. JBSS, LLC*, 200 N.C. App. 162, 172, 684 S.E.2d 41, 50 (2009) (quotation and emphasis omitted). An act is deceptive if it "has a tendency to deceive." *Dalton*, 353 N.C. at 656, 548 S.E.2d at 711; *see also Overstreet v. Brookland, Inc.*, 52 N.C. App. 444, 452-52, 279 S.E.2d 1, 7 (1981) (explaining that in order "to succeed under G.S. 75-1.1, it is not necessary for the plaintiff to show fraud, bad faith, deliberate or knowing acts of deception, or actual deception, plaintiff must, nevertheless, show that the acts complained of possessed the tendency or capacity to mislead, or created the likelihood of deception"). The intent of the defendant and the defendant's good faith are irrelevant. *Marshall v. Miller*, 302 N.C. 539, 548, 276 S.E.2d 397, 403 (1981).

Defendants' first argument does not attack any Plaintiffs' allegations as to any of the three required elements for an UDTPA claim. Rather, as this court already has observed, Defendants' argument amounts to a preemption claim. For the same reasons stated above, the court finds Defendants' first argument to be without merit.

37

Defendants' second argument attacks the first element of an UDTPA claim, that is, whether their actions, if proven, amount to an unfair or deceptive trade practice or act. Here, Defendants argue that as a matter of law, they cannot be held liable under UDTPA because they were entitled to use foreclosure as a remedy under the loan documents. The court, however, does not view the issue as to whether foreclosure was allowed under the law. Rather, the issue is the manner in which Defendants pursued the foreclosure sale, and whether that was unfair or deceptive. Where, as here, Plaintiff alleges, *inter alia*, that Defendant Homeward provided her with false information about the HAMP process and the status of the foreclosure sale of her property–including the statement that the foreclosure sale would not go forward while her loan modification application was being processed–there is a plausible claim that Defendants' actions were unfair or had the tendency to deceive. Accordingly, the court concludes that Plaintiff alleges sufficient facts with regard to the first element of the UDTPA claim.

Defendants' last argument concerns the third element of the UDTPA claim, that is, whether their actions proximately caused Plaintiff's injury. Plaintiff alleges that she relied on Defendant Homeward's statements and advice regarding the HAMP application process and the scheduling of the foreclosure sale. She also alleges that because of that reliance, she did not file for bankruptcy or otherwise redeem her property. In other words, Plaintiff plausibly alleges that Defendants' misrepresentations about the foreclosure sale proximately caused her to forego any other remedy to prevent the sale of her home or the redemption of her property.

Because Plaintiff plausibly alleges all three elements of an UDTPA claim, Defendants' Motion to Dismiss will be DENIED as to Plaintiff's fourth claim for relief.

## IV. MOTION FOR PRELIMINARY INJUNCTION

38

A preliminary injunction is an extraordinary interlocutory remedy "involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances." *MicroStrategy, Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (quotation omitted). It is "never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 690 (2008). Rather, a court, in its discretion, may issue a preliminary injunction only if the moving party clearly establishes the following factors: (1) she is likely to succeed on the merits; (2) she is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in her favor; and (4) an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *WV Ass 'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009).

According to the Complaint, Plaintiff in this action seeks entry of the property into a constructive trust, naming her as the beneficiary of the trust, and money damages. *See* Compl.

A constructive trust is a duty, or relationship, imposed by courts of equity to prevent the unjust enrichment of the holder of title to, or of an interest in, property which such holder acquired through fraud, breach of duty or some other circumstance making it inequitable for him to retain it against the claim of the beneficiary of the constructive trust. A constructive trust is a fiction of equity, brought into operation to prevent unjust enrichment through the breach of some duty or other wrongdoing. There is a common, indispensable element in the many types of situations out of which a constructive trust is deemed to arise. This common element is some fraud, breach of duty or other wrongdoing by the holder of the property.

*Bissette v. Harrod*, -- S.E.2d --, 2013 WL 1110666, at \*8 (N.C. Ct. App. Mar. 19, 2013) (quotation and alterations omitted). Generally, a "constructive trust will not be imposed if there is no fiduciary duty between the parties." *Lawyers Paralegal Training Progams, LLC v. Guilford Coll.*, 737 S.E.2d 191, 2013 WL 432646, at \*5 (N.C. Ct. App. Feb. 5, 2013) (unpublished table opinion) (citing *Sec. Nat. Bank of Greensboro v. Educators Mut. Life Ins. Co.*, 265 N.C. 86, 95, 143 S.E.2d 270, 276 (1965) (stating that "[a] constructive trust does not arise where there is no fiduciary relationship and

there is an adequate remedy at law")). Nevertheless, a fiduciary relationship is not absolutely required, and other circumstances may exist which allow entry of a constructive trust. *See Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs.*, LLC, 365 N.C. 520, 530-31, 723 S.E.2d 744, 752 (2012) ("[A] fiduciary relationship, while generally the basis for constructive trust claims, is not strictly required. In the absence of such a relationship, [a plaintiff] faces the difficult task of proving some other circumstance making it inequitable for [the defendant] to possess the [property]. We have also used the phrase, 'any other unconscientious manner,' in describing situations in which a constructive trust may be imposed without a fiduciary relationship." (quotations omitted)).

To date, the arguments set forth by the parties primarily concern whether Plaintiff states any viable causes of action. The court herein rules on such issues. However, in the court's view, the parties do not adequately address the merits of the Motion for Preliminary Injunction, particularly the nature of the remedy to which Plaintiff is entitled if she is ultimately victorious at trial. If her allegations support entry of a constructive trust, then it would seem to the court (although not affirmatively deciding the issue) that it may allow a preliminary injunction preventing her eviction pending resolution of the action. If, however, her allegations support only an entitlement to money damages, it would seem to the court (although not affirmatively deciding the issue) that no such injunction should be entered because she would be required to vacate the property at the conclusion of the case regardless of whether she wins. Accordingly, the court will order additional briefing on the Motion for Preliminary Injunction pursuant to the rulings made in this Order, and will stay resolution of the motion until such briefing is completed.

## V. CONCLUSION

For the above stated reasons, it is hereby ORDERED that:

1.    The Motion to Dismiss [DE-14] is ALLOWED in part as to Plaintiff's claim for constructive fraud, and DENIED in all other respects consistent with this Order; and

2.    Disposition of the Motion for Preliminary Injunction [DE-1-1] will be STAYED pending further briefing on the matter. On or before **April 22, 2013**, Plaintiff shall submit a brief, not longer than 15 pages, indicating why, pursuant to the rulings made in this Order, a preliminary injunction should be entered. On or before **May 6, 2013**, Defendants shall submit a brief, not longer than 15 pages, responding to Plaintiff's brief. The court will thereafter enter its ruling. Failure by either party to submit a supplemental brief may result in an adverse disposition of the pending Motion for Preliminary Injunction.

SO ORDERED

This the 1st day of April, 2013.

James C. Fox

JAMES C. FOX
Senior United States District Judge